UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| DANIEL HARVEY RIGGS, | Case No. 3:21-cv-00071-ART-CSD |
| Petitioner, | MERITS ORDER |
| v. | |
| NETHANJAH BREITENBACH, et al.,[1] | |
| Respondents. | |

Petitioner Daniel Riggs filed a First Amended Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 ("Petition") raising four grounds for relief from his attempted-sexual-assault convictions: (1) invalid nolo contendere plea caused by prosecutorial misconduct; and (2) ineffective assistance of trial counsel during plea negotiations in failing to inform him that (a) one victim has a medical condition affecting her brain, (b) a different victim made inconsistent statements to investigators, and (c) videos of him engaging in rough but consensual sex with his former girlfriend would be inadmissible at trial. (ECF No. 28). For the reasons discussed below, this Court denies the Petition and a certificate of appealability.

## I.    BACKGROUND

### A.    Factual background[2]

#### 1.    Victim Megan L. (state criminal case CR13-1067)

Megan testified before the grand jury that she attended the University of Nevada, Reno, until 2007 when she was diagnosed with a non-traumatic brain

---

[1] The Nevada Department of Corrections inmate database states that Riggs is incarcerated at Lovelock Correctional Center. Nethanjah Breitenbach is the current warden for that facility. At the end of this order, this Court directs the Clerk of the Court to substitute Nethanjah Breitenbach for Respondent Timothy Filson. *See* Fed. R. Civ. P. 25(d).

[2] This summary is merely a backdrop to the Court's consideration of the issues in the Petition and should not be construed as credibility or fact findings.

injury caused by a spinal fluid leak in her brain that affects her long-term memory. (ECF No. 55-2 at 8). Megan is "very high functioning" for her diagnosis, which means that she can "carry on a conversation" and "remember things well." (*Id.* at 8–9).

Megan returned to Reno in June 2009 to attend a friend's bachelorette party and meet with Riggs who ran in her group of college friends and had befriended her on social media. (*Id.* at 10–11). Megan told Riggs that she was looking for a long-term relationship and not interested in sex for a while. (*Id.* at 12). Megan met Riggs in the lobby of her hotel on June 20th and the two went for drinks at the Hideout bar. (*Id.* at 13–14). Riggs returned Megan to her hotel, and she departed to Rum Bullions with the bachelorette party. (*Id.* at 15).

Riggs unexpectedly showed up at Rum Bullions claiming he was there with friends, but Megan saw none. (*Id.* at 16). Megan didn't tell Riggs she'd be there; she wasn't planning the party and didn't know where they'd go. (*Id.* at 30). Riggs repeatedly approached the bachelorette group with drinks for Megan, but she refused and handed them to other people. (*Id.* at 16). The bachelorette group seemed to enjoy Riggs's company and he was very charismatic. (*Id.*)

Megan didn't see Riggs drink much and he didn't seem intoxicated. (*Id.* at 32). At the end of the night, Megan and Riggs agreed they wanted to keep talking. (*Id.* at 16). Megan suggested her hotel room where she'd feel more comfortable because there wasn't any alcohol there. (*Id.* at 17).

When they arrived at the hotel room, Megan again told Riggs that she did not want to have any form of sexual contact with him, which he said was fine. (*Id.*) The two talked and played cards for an hour and then began to kiss on the bed. (*Id.* at 18). Riggs undressed Megan to her underwear, stood and fully undressed himself, mounted Megan, clamped his hand on her neck, pulled her underwear to the side, and tried to insert his penis into her vagina. (*Id.*)

//

Riggs's hand was so tight on Megan's throat that she couldn't scream and had trouble breathing. (*Id.* at 19). Megan told Riggs no, she didn't want to do this. (*Id.*) He responded, "What did you expect?" (*Id.*) And asked Megan if she wanted to feel the tip or feel it inside of her. (*Id.*) She kept refusing: "At least five no's and several, 'Don't do this. I don't want you to do this.'" (*Id.*)

Riggs had partially penetrated her vagina, it burned, and she pushed against Riggs's chest, but he just fell back in place. (*Id.*) She sat up on the bed, but Riggs stuck his penis into her mouth, grabbed the back of her head and hair, and thrust his penis back and forth in her mouth. (*Id.* at 19–20). He thrust so hard that it hurt and caused her to vomit on him. (*Id.* at 20).

Riggs let Megan clean herself in the bathroom. (*Id.* at 21). When she returned Riggs was masturbating and he pushed her face down to suck on his testicles, ejaculated on her face, and fell asleep. (*Id.* at 22). Panicked, Megan remained in the room until Riggs woke around 6 or 7 the next morning. (*Id.* at 23).

Megan told Riggs that he'd hurt her physically and emotionally. (*Id.*) Riggs coldly responded he was so drunk he didn't remember what he'd done and then placed Megan's hand on his erect penis. (*Id.* at 23–24). Megan again said she didn't want to have sex, but he pushed her down, shoved her underwear aside, and shoved his penis fully into her vagina. (*Id.* at 24–25). He choked her harder this time but didn't cause her to pass out. (*Id.* at 25). Megan kept saying no and don't do this, but Riggs showed no emotion. (*Id.*) He pulled out of her vagina and used her breasts to masturbate. (*Id.*) Megan kept saying no. (*Id.*) Riggs thrust his penis into her mouth and ejaculated. (*Id.*)

Shocked and running on auto pilot, Megan agreed to drive Riggs home. (*Id.* at 26). When Megan declined his offer to date, he said "You know that you are better than me. You are smarter than me and you are funnier than me. And that's why I had to do this." (*Id.* at 26–27). Megan returned home and reported the crime

1    to the Sacramento Police Department. (*Id.* at 27). The police collected evidence,

2    including the underwear Megan wore during the assault. (*Id.*)

3    Riggs texted Megan to see her again. (*Id.* at 28). She said that she'd

4    contacted the police and to stop contacting her. (*Id.*) He repeatedly called her after

5    the text exchange. (*Id.*) She didn't take his calls and eventually obtained a

6    restraining order against him. (*Id.*)

### 2.    Victim Kayla H. (state criminal case CR13-1364)

8    Kayla testified before the grand jury that in 2013 she lived in Sparks,

9    Nevada, with her parents, her sister, her sister's boyfriend, and her four-year-old

10   daughter. (ECF No. 55-1 at 8). Kayla and Riggs had attended the same high

11   school and were acquaintances. (*Id.* at 9). They became reacquainted after

12   graduation through a dating website and planned a date for February 24th to

13   watch a movie at Kayla's house after her daughter fell asleep. (*Id.* at 9–10).

14   Kayla didn't dress up for the date; she wasn't trying to have any kind of

15   sexual interaction. (*Id.* at 12). They watched a scary movie that Riggs had

16   selected. (*Id.*) Kayla had one beer. (*Id.*) Riggs kept trying to get her to drink more

17   but she didn't feel comfortable and refused. (*Id.*) Riggs got Kayla a vodka and

18   cranberry drink from his Subaru anyway. (*Id.* at 13). Kayla took a couple of baby

19   sips to stop Riggs pestering her about it. (*Id.*) Then he brought up the topic of

20   Brianna Denison who had been murdered by James Biela. (*Id.*) Riggs kept saying

21   that Biela strangled his victims before raping them and Brianna died because she

22   was so petite. (*Id.*) Kayla, who is also petite, got scared. (*Id.* at 14).

23   Riggs then rubbed Kayla's leg, grabbed her face, and leaned in to try to kiss

24   her. (*Id.*) Kayla didn't want that to happen, so she got up and checked on her

25   daughter who was sleeping in Kayla's bedroom. (*Id.* at 14–15). Kayla saw Riggs

26   just standing there as she walked out of the room. (*Id.* at 15). He tried to remove

27   her clothing as he guided her toward the closet in the room. (*Id.*) Kayla didn't

28   resist because she was afraid Riggs would hurt her daughter. (*Id.*)

4

Riggs undressed Kayla and himself in the closet, laid them down, placed his hand around her throat, and started having vaginal sex with her. (*Id.* at 16). Kayla could barely breathe and was afraid. (*Id.*) Riggs kept putting his fingers into Kayla's throat, gagging her. (*Id.* at 16–17). She bit him but Riggs only thrust his fingers further into her throat. (*Id.*) The sex was painful and forceful; Riggs injured her spine. (*Id.*) But Kayla kept quiet, hoping her daughter wouldn't wake and would be kept safe. (*Id.*)

Riggs pulled out, turned Kayla onto her knees, and put his penis into her anus. (*Id.* at 18). Kayla then repeatedly said, "No, please stop. Please." (*Id.*) She was crying but Riggs kept going for at least five minutes. (*Id.*) Then Riggs grabbed Kayla's face and shoved his fingers into her mouth, opened her teeth, and forced his penis and testicles inside her mouth. (*Id.* at 18–19). Although Kayla had vomited and was crying and turning her head away, Riggs kept thrusting into her mouth. (*Id.* at 19). Kayla could not escape because Riggs held her with both hands. (*Id.*)

Riggs eventually stopped, masturbated, and ejaculated onto Kayla's face. (*Id.* at 20). He got dressed, told Kayla her back looked like it hurt and she should do something about it, and left. (*Id.*) Kayla called a friend and then reported the crime to the police. (*Id.*) She was examined by a Sexual Assault Forensic Examiner early the next morning. (*Id.* at 20–21). The nurse reported abrasions and bruising on both of Kayla's knees, friction abrasions on her spine, intense redness and bruising on the uvula part of her mouth, hemorrhaging of the area behind the uvula, lacerations on her anus, redness and bruising in her rectum, and intense redness and bruising on her cervix, all indicative of forceful oral, vaginal, and anal intercourse. (*Id.* at 33–38).

Days later at the detective's request, Kayla texted Riggs to speak with her on the phone. (*Id.* at 21, 26–28). During the call, Riggs apologized and said they had both been drinking and he'd kept his penis in Kayla's anus after she asked

1    him to stop for only a few seconds—because he counted—but he'll "buy that" if

2    she wanted to say it was a couple of minutes. (*Id.* at 22, 28–29). Police overheard

3    the discussion because Kayla's phone was on speaker. (*Id.* at 22, 28–29).

4    ## B.    Procedural background

5        The State of Nevada charged Riggs with two counts of sexual assault and

6    one count of battery with the intent to commit sexual assault pertaining to Megan

7    in C13-1067 and one count of attempted sexual assault pertaining to Kayla in

8    CR13-1364. (ECF Nos. 34-24, 34-31). In August 2013, Riggs pled no contest to

9    one count of attempted sexual assault in each case. (ECF Nos. 34-32, 36-23, 36-

10   24). After the trial court denied Riggs's motion to withdraw his no-contest plea in

11   CR13-1067, it sentenced him to a minimum term of 96 months to a maximum

12   term of 240 months for attempted sexual assault and credited him with 161 days

13   for time served. (ECF Nos. 34-37, 55-10, 36-23). After the trial court denied

14   Riggs's motion to withdraw his no-contest plea in CR13-1364, it sentenced him

15   to a minimum term of 96 months to a maximum term of 240 months, to be served

16   consecutive to the sentenced imposed in CR13-1067, and it credited him with 35

17   days for time served. (ECF Nos. 34-38, 55-10, 36-24). Riggs's amended

18   judgments of conviction were entered on December 24, 2013. (ECF Nos. 36-23,

19   36-24).

20       Riggs appealed, (ECF Nos. 36-25, 36-28), and the Nevada Court of Appeals

21   affirmed the convictions. (ECF No. 37-35). The Nevada Supreme Court denied

22   Riggs's petitions for review. (ECF Nos. 37-39, 37-40). And remittitur issued in

23   both cases on April 8, 2015. (ECF Nos. 37-41, 37-42).

24       Riggs filed pro se state post-conviction habeas petitions on March 8, 2016,

25   (ECF Nos. 37-50, 38-1), which he amended on April 19, 2016. (ECF No. 38-2).

26   After Riggs was appointed counsel, he filed supplemental petitions on March 16,

27   2018. (ECF Nos. 38-38, 38-39). The state court denied post-petition relief on April

28   5, 2019. (ECF Nos. 39-5, 39-6). Riggs appealed, the cases were consolidated on

appeal, and the Nevada Court of Appeals affirmed on October 9, 2020. (ECF No. 39-39). Remittitur issued on November 5, 2020. (ECF No. 39-40).

Riggs transmitted his original federal petition for writ of habeas corpus on February 2, 2021, asserting 38 grounds for relief. (ECF No. 5). This Court granted Riggs leave to file an amended petition by May 26, 2022. (ECF Nos. 20, 22, 25, 29). He timely filed the instant Petition on May 24, 2022. (ECF No. 28). Riggs's Petition presents four grounds for relief:

1.  The prosecutor denied him due process by withholding information about other possible crimes during plea negotiations and thus precluded his plea from being knowing, intelligent, and voluntary.

2.  Trial counsel was ineffective for failing to tell him that Megan had a medical condition affecting her brain and memory.

3.  Trial counsel was ineffective for not telling him that Kayla made inconsistent statements to investigators.

4.  Trial counsel was ineffective for not telling him that videos of him engaging in rough but consensual sex with a non-party were inadmissible at trial.

Respondents moved to dismiss the Petition but later withdrew that motion. (ECF No. 47). Respondents filed their answer to all grounds in the Petition on August 14, 2023. (ECF No. 56). Riggs filed his reply on June 24, 2024. (ECF No. 65).

## II.    GOVERNING STANDARD OF REVIEW

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty act ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in the State court proceedings unless the adjudication of the claim –

1
2

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

3
4

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

5 Under § 2254(d)(1)'s first clause, a state court decision is contrary to clearly

6 established Supreme Court precedent "if the state court applies a rule that

7 contradicts the governing law set forth in [the Supreme Court's] cases" or if the

8 state court decides a case differently than the Supreme Court on "a set of facts

9 that are materially indistinguishable" from the Supreme Court's case. *Lockyer v.*

10 *Andrade*, 538 U.S. 63, 73 (2003) (cleaned up) (quoting *Williams v. Taylor*, 529

11 U.S. 362, 405–06 (2000); citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). Under

12 § 2254(d)(1)'s second clause, a state court decision is an unreasonable

13 application of clearly established Supreme Court precedent "if the state court

14 identifies the correct governing legal principle from [the Supreme] Court's

15 decisions but unreasonably applies that principle to the facts of the prisoner's

16 case." *Id.* at 75 (cleaned up) (quoting *Williams*, 529 U.S. at 413).

17 And under § 2254(d)(2), "a state-court factual determination is not

18 unreasonable merely because the federal habeas court would have reached a

19 different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301

20 (2010). "Instead, § 2254(d)(2) requires that [federal habeas courts] accord the

21 state trial court substantial deference." *Brumfield v. Cain*, 576 U.S. 305, 314

22 (2015). Thus, "[i]f reasonable minds reviewing the record might disagree about

23 the finding in question, on habeas review that does not suffice to supersede the

24 trial court's determination." *Id.* (cleaned up) (quoting *Wood*, 558 U.S. at 301); and

25 *Rice v. Collins,* 546 U.S. 333, 341–342 (2006)). "This is a daunting standard—one

26 that will be satisfied in relatively few cases." *Taylor v. Maddox*, 366 F.3d 992,

27 1000 (9th Cir. 2004), *abrogated on other grounds as stated in Murray v. Schriro*,

28 745 F.3d 984, 999–1000 (9th Cir. 2014)).

8

1  But "the standard is not impossible to meet . . . ." *Id.* (citing *Miller-El v.*

2  *Cockrell*, 537 U.S. 332, 340 (2003)). For it is met if "the state courts plainly

3  misapprehend or misstate the record in making their findings, and the

4  misapprehension goes to a material factual issue that is central to petitioner's

5  claim, that misapprehension can fatally undermine the fact-finding process,

6  rendering the resulting factual finding unreasonable." *Id.* at 1001 (citing *Wiggins*

7  *v. Smith*, 539 U.S. 510, 526–30 (2003); and *Hall v. Director of Corr.*, 343 F.3d 976,

8  983 (9th Cir. 2003)).[3]

9  **III.  DISCUSSION**

10  **A.    Ground 1—validity of nolo contendere pleas**

11  In ground 1, Riggs alleges that his nolo contendere pleas were not

12  knowingly, intelligently, or voluntarily entered because the State purposefully

13  withheld evidence about uncharged crimes that a different state's authorities

14  were actively investigating. (ECF No. 28 at 7–10).

15  **1.    Background information**

16  In exchange for Riggs's nolo contendere plea to one count of attempted

17  sexual assault in each case, the State agreed to drop any remaining charges and

18  not to pursue charges in two matters that were being investigated by the Reno

19  Police Department (Case Nos. 07-20350 and 08-33484) or any other case of

20  sexual assault for which Riggs was subject to prosecution in Washoe County.

21  (ECF No. 34-32). One day after Riggs pled in the first case, a grand jury in

22  Jackson County, Oregon, returned an indictment charging him with one count

23  of first-degree sodomy, one count of second-degree sexual abuse, two counts of

24  promoting prostitution, and one count of compelling prostitution of his former

25

26  [3] Riggs generally argues that the Court should review his claims de novo because

27  AEDPA violates numerous parts of the U.S. Constitution. (ECF No. 28 at 7). The Court declines to reach this argument because Riggs provides no authorities or

28  analysis save for admitting that the Ninth Circuit in *Crater v. Galaza*, 491 F.3d 1119 (9th Cir. 2007), rejected "some" of his "arguments." (*Id.*)

girlfriend, Tephany H. (ECF No. 35-21). On September 12, 2013, Riggs moved for

discovery and sanctions in the Nevada cases, arguing the prosecutor withheld a

May 17, 2013, report prepared by Sparks Police Department ("SPD") detectives

concerning their interview of Tephany H. until September 4, 2013, after Riggs

had pled in both Nevada cases. (ECF Nos. 34-33, 34-34). Riggs also moved to

withdraw his no-contest pleas based on the timing of that disclosure. (ECF

Nos. 34-37, 34-38).

In affidavits accompanying the motions to withdraw, Riggs testified:

> I pleaded No Contest in this case and in case no. CR13-1364 concerning KAYLA H. based upon my understanding that all materials and information concerning statements I had made previously, as well as all information concerning my criminal record, had been provided by the prosecutor. Had I known that all such information had not been provided by the prosecutor, and especially that concerning TEPHANY H. and the investigation by SPD Det. Keating in Oregon discussed in this Motion, I would not have pleaded No Contest pursuant to the plea negotiations with only the Nevada prosecutor in this case, and would have instead gone to trial on the original Nevada charges.

> I pleaded no contest in this case and in case no. CR13-1334 [sic] concerning KAYLA H. based upon my understanding that no other criminal prosecutions were pending against me. Had I known about the then-unfiled-yet-pending prosecution in Oregon concerning TEPHANY H., I would not have pleaded No Contest pursuant to the plea negotiations with only the Nevada prosecutor in this case, and would have instead gone to trial on the original Nevada charges.

> My intent in pleading No Contest in this case and in case no. CR13-1364 concerning KAYLA H. was to achieve a global resolution of any and all criminal prosecutions arising out of and related to the criminal investigation begun and maintained by SPD Det. Keating and his associates. Had I known that Det. Keating and his associates had obtained incriminating information from TEPHANY H. and provided it to an Oregon police detective, I would not have pleaded No Contest pursuant to the plea negotiations with only the Nevada prosecutor in this case, and would have instead gone to trial on the original Nevada charges.

> I prefer to fight the original Nevada charges now, rather than go to Oregon having been convicted on my No Contest pleas and attempt to confront the Oregon charges as a convicted felon and sex offender. That would have been my preference prior to pleading No Contest.

(ECF No. 34-37 at 15–16).

//

The State argued that SPD detectives became aware of Tephany when executing a search warrant on Riggs's phone. (ECF Nos. 34-35 at 3; 37-22 at 29). Tephany told the detective that she had dated Riggs in Nevada, and he frightened her "by pinning her in a 'lock out' position." (*Id.*) But she gave Riggs a chance to "prove himself to her" and he persuaded her to move with him to Oregon. (*Id.*) While in Oregon, Riggs "sodomized her, [and] forced fellatio upon her that made her gag and choke, like the sexual assaults he committed in Washoe County." (*Id.*) Riggs made her "work as a prostitute while [he] acted as her pimp, and [he] placed ads on sites like Redbook, or Backpage.com." (*Id.*) And Riggs arranged for Tephany "to commit acts of prostitution, and take her to meet the johns, collect the money, and drive [her] home from the 'dates.'" (*Id.*) SPD detectives sent their reports to law enforcement in Oregon, and Oregon authorities determined to seek a grand jury indictment. (ECF No. 34-35).

The prosecutor sought to introduce prior-bad-act evidence two weeks before Riggs pled in the first Nevada case (CR13-1067), but none of the proffered evidence concerned the Oregon investigation or Tephany. (ECF No. 34-17). Trial counsel argued that in a telephone conversation on September 4, 2013, after the prosecutor disclosed the police report and information about the then-charged Oregon crimes, the prosecutor justified the disclosure stating she "figured they'd come in at sentencing anyway, so . . . ." (ECF No. 35-4 at 44). In response to Riggs's motions, the prosecutor argued she withheld the police report and information about the Oregon investigation because disclosure "would have seriously interfered with Oregon's ability to indict" Riggs by prematurely disclosing Oregon's witness information and exposing them to potential harm. (ECF No. 35-2 at 6–7). The prosecutor "was not aware that Oregon had finally indicted the defendant until days later." (ECF No. 35-6 at 6). And the Oregon prosecutor did not tell the Nevada prosecutor about the return of the indictment; rather, Nevada police "made that contact." (*Id.* at 9).

The prosecutor also explained that she would not have sought to admit evidence about Riggs's prior bad acts against Tephany in the State's case in chief because those acts "were not 'date-rape' offenses, and Riggs's conduct of pimping out [Tephany], and furiously beating and raping her raised a danger of unfair prejudice which might not overcome such evidence's probative value." (ECF No. 34-35 at 7 (emphasis omitted)). The "evidence did not fit the State's theory of the case that [Riggs] is a date rapist who rapes his victims on the first date." (*Id.*) "This evidence is not favorable to the defense, it is not exculpatory, or even materially relevant to the crimes charged, and [Nevada] would not have disclosed the evidence if no indictment had been returned" in Oregon. (*Id.* at 8; *accord* ECF No. 55-9 at 37 (explaining that evidence about Riggs's acts involving Tephany "was more prejudicial than probative, because it is far more brutal, repeated, disgusting than anything that came out with any of the other one-time victims of the defendant")).

### 2. State court determination

In affirming Riggs's judgments of conviction, the Nevada Court of Appeals ("NCA") held:

*Prosecutorial misconduct*

Riggs claims that prosecutorial misconduct deprived him of due process under the state and federal constitutions. Riggs argues that the prosecutor intentionally withheld discovery of a Sparks Police Department report concerning uncharged misconduct committed in Oregon until after he had entered his nolo contendere pleas. And Riggs asserts that the prosecutor's discovery violation perverted the plea bargaining process.

We analyze claims of prosecutorial misconduct in two steps: first, we determine whether the prosecutor's conduct was improper, and second, if the conduct was improper, we determine whether it warrants reversal. *Valdez v. State*, 124 Nev. 1172, 1188, 196 P.3d 465, 476 (2008). "[We] will not reverse a conviction based on prosecutorial misconduct if it was harmless error." *Id.*

Riggs presented this claim as a discovery violation in the court below and sought sanctions against the prosecutor. The district court found that the report in question related to an investigation being considered by a sitting grand jury in Oregon and that the State's disclosure of information concerning an ongoing investigation in

another jurisdiction would have been inappropriate and perhaps illegal. We note that the report was made available to Riggs shortly after he was indicted by the Oregon grand jury, and we conclude that Riggs has not demonstrated that the prosecutor's conduct was improper in this regard.

*Motion to withdraw plea*

Riggs claims that the district court erred by denying his motions to withdraw his nolo contendere pleas, which were based on claims of factual innocence. Riggs asserts that he would not have entered his nolo contendere pleas if he had known that he would be facing charges for similar criminal conduct in Oregon. And Riggs argues that he should have been allowed to withdraw his pleas because the prosecutor had intentionally withheld discovery of information critical to his plea decisions, his pleas were entered under a misconception of their consequences, and his motions to withdraw were made before the State suffered any prejudice.

A defendant may move to withdraw a plea before sentencing, NRS 176.165, and the district court may, in its discretion, grant such a motion "for any substantial, fair, and just reason." *Crawford v. State,* 117 Nev. 718, 721, 30 P.3d 1123, 1125 (2001). "The question of a [defendant's] guilt or innocence is generally not at issue in a motion to withdraw a guilty plea." *Hargrove v. State,* 100 Nev. 498, 503, 686 P.2d 222, 224 (1984). "On appeal from a district court's denial of a motion to withdraw a guilty plea, [we] will presume that the lower court correctly assessed the validity of the plea, and we will not reverse the lower court's determination absent a clear showing of an abuse of discretion." *Riker v. State,* 111 Nev. 1316, 1322, 905 P.2d 706, 710 (1995) (internal quotation marks omitted).

The district court heard argument on Riggs' motions and found, among other things, that Riggs was not entitled to discovery about the Oregon matter and his preference for proceeding to trial on the original Nevada charges rather than face the Oregon charges after having been convicted on his nolo contendere pleas was not a substantial reason for withdrawing the pleas. We conclude Riggs has not demonstrated that the district court abused its discretion in this regard.

> [FN1] To the extent that Riggs asks this court to modify the law regarding presentence motions to withdraw guilty pleas, we note that the Nevada Supreme Court's decisions are binding on this court and we decline to do so.

(ECF No. 37-35 at 5–7).

### 3.    Relevant law

"The longstanding test for determining the validity of a guilty [or nolo contendere] plea is 'whether the plea represents a voluntary and intelligent choice

among the alternative courses of action open to the defendant.'" *Hill v. Lockhart*, 474 U.S. 52, 56 (1985) (quoting *North Carolina v. Alford,* 400 U.S. 25, 31 (1970); citing *Boykin v. Alabama,* 395 U.S. 238, 242 (1969), and *Machibroda v. United States,* 368 U.S. 487, 493 (1962)). The voluntariness of a plea "can be determined only by considering all of the relevant circumstances surrounding it." *Brady v. United States*, 397 U.S. 742, 749 (1970) (cleaned up). "'A plea of guilty entered by one fully aware of the direct consequences . . . must stand unless induced by threats . . . , misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g. bribes).'" *Id.* at 755 (quoting with approval *Shelton v. United States*, 242 F.2d 101, 115 (5th Cir. 1957) (Tuttle, J., dissenting)).

The Supreme Court "has recognized that prosecutorial misconduct may 'so infect the trial with unfairness as to make the resulting conviction a denial of due process.'" *Greer v. Miller*, 483 U.S. 756, 765 (1987) (cleaned up) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "[D]ue process considerations include not only (1) the nature of the private interest at stake, but also (2) the value of the additional safeguard, and (3) the adverse impact of the requirement upon the Government's interests." *United States v. Ruiz*, 536 U.S. 622, 631 (2002) (citing *Ake v. Oklahoma*, 470 U.S. 68, 77 (1985)).

### 4.    Analysis

As noted above, NCA determined that the prosecutor did not engage in misconduct by withholding SPD's May 17, 2013, report during plea negotiations in the Nevada cases. In so holding, NCA found that the report was related to an investigation by a seated grand jury in Oregon, and it expressed concern that it would have been improper and perhaps illegal for the prosecutor to reveal information related to an ongoing grand jury investigation. Riggs argues this determination is objectively unreasonable under 2254(d)(2) because the

1    prosecutor could have disclosed the police report without revealing the existence

2    of the Oregon grand jury's proceedings. (ECF No. 65 at 13–14).

3        The police report is not part of the record in this proceeding.[4] This Court's

4    review is limited to the record that was before the NCA. *See Cullen v. Pinholster*,

5    563 U.S. 170, 181 (2011). However, that record reflects the Nevada detectives

6    interviewed Riggs's former girlfriend Tephany in Oregon, and the report contains

7    her statements about repeated acts of violence, sexual abuse, and forced

8    prostitution that Riggs committed against her while they were in a relationship

9    and living together in Oregon.

10       Nevada detectives turned their report over to Oregon's authorities who

11   determined to investigate further. The Oregon investigation was handled by a

12   different sovereign state's agents over whom the Nevada prosecutor had no

13   authority or direct contact, and it was put before a seated grand jury in Oregon.

14   Around this time, the prosecutor sought to introduce prior-bad-act evidence in

15   Nevada's first case-in-chief against Riggs, but none of the proffered evidence

16   concerned Tephany, i.e., the video of Riggs and Tephany engaging in rough but

17   consensual sex or Tephany's statements about Riggs's uncharged Oregon crimes.

18       Indeed, the Nevada prosecutor argued that the uncharged Oregon crimes

19   were inconsistent with the State's theory that Riggs raped his victims on the first

20   date, the Oregon evidence likely was more prejudicial than probative and thus

21   inadmissible to prove any element of the Nevada crimes, and disclosing

22   information about the uncharged Oregon crimes could interfere with Oregon's

23   active grand jury investigation and expose Oregon's witnesses to harm. Relatedly,

24   _____

25   [4] Redacted and unredacted copies of the report were admitted into evidence as
     Exhibits 4 (redacted) and 5 (unredacted) during the trial court's September 27,
26   2013, hearing. (ECF No. 34-30 at 14 (erroneously referring to "May 7, 2013" SPD
     report).) But those reports do not appear to have been part of the record in Riggs's
27   direct appeals. (*See, e.g.*, ECF Nos. 36-43 (joint appendix in appeal 64778), 37-6
28   (errata to joint appendix in appeal 64778), 37-7 (errata to joint appendix in appeal
     64780), 37-16 (notice correcting joint appendix in appeal 64780)).

1   Megan testified before the Nevada grand jury that Riggs continued to contact her

2   after she told him to stop and told him that she'd reported his acts to police, and

3   that he ceased contact only after she obtained a restraining order.

4        NCA correctly considered the totality of circumstances in adjudicating

5   Riggs's interrelated prosecutorial-misconduct and involuntary-plea claims. *See*

6   *Brady*, 397 U.S. at 749. NCA reasonably found that premature disclosure of

7   information related to the pending Oregon investigation would have been

8   improper. The record supports the reasonable inference that the uncharged

9   Oregon crimes were separate and distinct criminal acts from the first-date-rape

10   crimes being prosecuted in the Nevada cases. The record also supports the

11   reasonable inference that disclosure could undermine Nevada's and Oregon's

12   separate interest in securing "those guilty pleas that are factually justified,

13   desired by defendants, and help to secure the efficient administration of justice."

14   *See Ruiz*, 536 U.S. at 631–32 (reiterating that due process considerations include

15   "the adverse impact of the requirement upon the Government's interests").

16   Premature disclosure of that information could disrupt Oregon's ongoing

17   investigation and subject its witnesses to harassment and serious harm, which

18   the Supreme Court has held are "valid" concerns. *See id.* And "[i]t could require

19   [Nevada] to devote substantially more resources to trial preparation prior to plea

20   bargaining, thereby depriving the plea-bargaining process of its main resource-

21   saving advantages." *See id.* at 632.

22        NCA's determinations that (1) the prosecutor's withholding SPD's police

23   report concerning uncharged crimes being investigated by a seated grand jury in

24   Oregon during negotiation of separate crimes in Nevada was not improper and

25   (2) Riggs was not entitled to pre-plea discovery of SPD's police report are not

26   based on an unreasonable determination of the facts. Accordingly, the Court

27   declines to review those decisions de novo and instead applies deferential review

28   as required.

The NCA decisions are not contrary to, or an unreasonable application of, clearly established federal law. *See Brady*, 397 U.S. at 749 & 755 (holding that validity of a plea is based on the totality of the circumstances); *cf. Ruiz*, 536 U.S. at 630–31 (collecting cases and reiterating that the Constitution does not require a defendant's "complete knowledge of the relevant circumstances, but permits a court to accept a guilty plea, with its accompanying waiver of constitutional rights, despite various forms of misapprehension under which a defendant might labor"). Riggs argues that the State's failure to disclose its report about uncharged crimes in Oregon deprived him of essential information and rendered his plea invalid. Riggs acknowledges that this case does not concern the prosecution's duty to disclose exculpatory evidence. Rather, Riggs argues that courts have acknowledged that withholding inculpatory evidence could result in a due process violation in the context of a trial and that the same reasoning should apply in the plea context.

Yet none of the cases cited by Riggs support a due process violation here, where the withheld evidence involved separate, uncharged conduct. *See Coleman v. Calderon*, 210 F.3d 1047, 1052 (9th Cir. 2000) (finding no due process violation based on state's pretrial concealment of inculpatory evidence related to charged crimes; *Lindsay v. Smith*, 820 F.2d 1137, 1151 (11th Cir. 1987) (same); *Wooten v. Thaler*, 598 F.3d 215, 220 (5th Cir. 2010) (same). Relatedly*, the Ninth Circuit has held that a prosecutor's failure to disclose an investigation of independent, uncharged crimes during plea negotiations did not violate due process. *United States v. Krasn*, 614 F.2d 1229, 1234 (9th Cir. 1980) (finding the defendant's "gratuities charges and the antitrust charge involved independent criminal transactions" and the antitrust investigation was at a preliminary stage during plea negotiations); *United States v. Clark*, 218 F.3d 1092, 1097 (9th Cir. 2000) (finding the defendant's pawn-shop burglary and postal robberies "involved independent criminal transactions"; the government did not file an indictment

17

about the burglary until over a year after the plea agreement; and "the prosecutor's reasons for not disclosing the future charges do not suggest foul play"). Accordingly, Riggs is not entitled to habeas relief for ground 1.

### B.    Ground 2—Trial counsel ineffectiveness

In ground 2, Riggs alleges that his trial counsel was ineffective for withholding three pieces of information during plea negotiations: (1) Megan had a brain condition affecting her memory; (2) Kayla made inconsistent statements to investigators; and (3) video of Riggs engaging in rough but consensual sex with Tephany was inadmissible at trial.

### 1.    State court determination applicable to each subground

In affirming the state court's denial of Riggs's post-conviction petitions, NCA held:

> Riggs claims the district court erred by denying his petitions because defense counsel was ineffective. To state a claim of ineffective assistance of counsel sufficient to invalidate a judgment of conviction based on a guilty plea, a petitioner must demonstrate (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness and (2) a reasonable probability, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial. *Hill v. Lockhart,* 474 U.S. 52, 58-59 (1985); *Kirksey v. State,* 112 Nev. 980, 987-88, 923 P.2d 1102, 1107 (1996).
>
> The petitioner must show both components of the ineffective-assistance inquiry—deficiency and prejudice, *Strickland v. Washington,* 466 U.S. 668, 697 (1984), and the petitioner must demonstrate the underlying facts of his claim by a preponderance of the evidence, *Means v. State,* 120 Nev. 1001, 1012, 103 P.3d 25, 33 (2004). We review the district court's resolution of ineffective-assistance claims de novo, giving deference to the court's factual findings if they are supported by substantial evidence and not clearly wrong. *Lader v. Warden,* 121 Nev. 682, 686, 120 P.3d 1164, 1166 (2005).
>
> * * *
>
> Riggs also claims the district court erred by finding that his testimony was not credible. "[T]he district court is in the best position to adjudge the credibility of the witnesses and the evidence, and unless this court is left with the definite and firm conviction that a mistake has been committed, this court will not second-guess the trier of fact." *Rincon v. State,* 122 Nev. 1170, 1177, 147 P.3d 233, 238 (2006) (internal quotation marks omitted). We have reviewed the evidentiary hearing transcript, and we are not convinced that the district court made a mistake.

1    (ECF No. 39-39 at 2–3, 5).

2                    **2.    Relevant law**

3         In *Strickland v. Washington*, the Supreme Court propounded a two-prong

4    test for analyzing ineffective-assistance-of-counsel claims that requires the

5    petitioner to demonstrate (1) the attorney's "representation fell below an objective

6    standard of reasonableness" "under prevailing professional norms" and (2) the

7    attorney's deficient performance prejudiced the defendant such that "there is a

8    reasonable probability that, but for counsel's unprofessional errors, the result of

9    the proceeding would have been different." 466 U.S. 668, 688 & 694 (1984).

10   "Failure to make the required showing of either deficient performance or sufficient

11   prejudice defeats the ineffectiveness claim." *Id.* at 700. "[T]he ultimate focus of

12   inquiry must be on the fundamental fairness of the proceeding whose result is

13   being challenged." *Id.* at 696.

14        A federal habeas court's "scrutiny of counsel's performance must be highly

15   deferential." *Id.* at 689. "A fair assessment of attorney performance requires that

16   every effort be made to eliminate the distorting effects of hindsight, to reconstruct

17   the circumstances of counsel's challenged conduct, and to evaluate the conduct

18   from counsel's perspective at the time." *Id.* Under the prejudice prong, "[a]

19   reasonable probability is a probability sufficient to undermine confidence in the

20   outcome." *Id.* at 694.

21        "The standards created by *Strickland* and [AEDPA] are both highly

22   deferential, and when the two apply in tandem, review is 'doubly' so . . . ."

23   *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (cleaned up). Thus, "[w]hen

24   [AEDPA] applies, the question is not whether counsel's actions were reasonable.

25   The question is whether there is any reasonable argument that counsel satisfied

26   *Strickland*'s deferential standard." *Id.*

27   //

28   //

### 3.    Ground 2(a)—Megan's brain condition

In ground 2(a), Riggs alleges that his trial counsel was ineffective for failing to tell him before he pled nolo contendere that Megan had a brain condition that might have affected her memory of the events. (ECF No. 28 at 12).

### a.    State court determination

In affirming the state court's denial of Riggs's post-conviction petitions, NCA held:

> First, Riggs claimed in his petition that defense counsel was ineffective for failing to inform him that victim Megan had a brain injury that may have compromised her ability to testify about the charges. The district court held an evidentiary hearing and made the following findings. Defense counsel could not testify at the evidentiary hearing because he is deceased. Riggs did not testify truthfully when he said that counsel failed to inform him of Megan's possible injuries. He did not prove that counsel's performance was deficient or that he was prejudiced. And he did not demonstrate that Megan's trial testimony would have been unreliable to the extent that he would have insisted on going to trial. We conclude the district court's findings are supported by the record and are not clearly wrong, Riggs failed to meet his burden to demonstrate that counsel was ineffective, and the district court did not err by rejecting this claim.

(ECF No. 39-39 at 3).

### b.    Analysis

### i.    28 U.S.C. § 2254(d)(2)

Riggs contends that NCA's adjudication of his ineffective-assistance claim about Megan's brain condition is not entitled to deference because it was based on an unreasonable determination of the facts. Specifically, Riggs argues that the state district court implied during the evidentiary hearing that it would not question trial counsel's actions retrospectively because he died in the interim. (ECF No. 65 at 21–22). Second, the state court "doubted Riggs's credibility simply because [trial counsel] was known to be a formidable defense attorney." (*Id.* at 22). Finally, the state court unreasonably found that Riggs's affidavit attached to the motions to withdraw his pleas undermined his claim. (*Id.* at 22–23). The Court rejects this challenge.

Although the state court found it "very marginally relevant at best" given earlier litigation on the issue, it allowed Riggs to develop his theory that his pleas were involuntary in part because trial counsel refused to provide him discovery while he was in the jail's general population due to the sexual nature of his charges. (ECF No. 55-17 at 10–12). Riggs opined that failing to give him discovery to review was not routine, although he assumed it was at the time. (*Id.* at 12–13). The state court overruled the State's objection explaining, "I'm going to allow some of this to happen, [counsel]. I hear your objection. I'll give you latitude on cross examination to develop the speculative nature of his supposition about what is or isn't routine." (*Id.* at 13).

Additionally, the state court's comments about the sometimes overly zealous nature of trial counsel's advocacy show that, contrary to Riggs's claim, it was not biased in favor of trial counsel:

> It is no understatement to say that these files are replete with zealous, vigorous, at times unnecessarily sharp-edged advocacy. What do I mean? There were personal attacks against [the prosecutor] in these cases. Those personal attacks were over the top. In my view, given the evidence as I understand it, unnecessary, but nonetheless they were made. And they were made in defense of Mr. Riggs. That's but one of the innumerable examples of the way in which [trial counsel] sought to defend Mr. Riggs vigorously.

(*Id.* at 142). Relatedly, the state court did not doubt Riggs's credibility based solely on the strength of trial counsel's reputation. Rather, the state court detailed several reasons why it found that Riggs was not being truthful.

First, the state court stated that Riggs was negatively affecting his credibility by opining "about the statute of limitations issue related to his potential civil rights claim while at the same time denying his understanding of the meaning of the word sexual assault." (*Id.* at 46; *accord id.* at 143–44). This was a reasonable determination. Riggs wrote letters to the state court claiming that court deputies "sexually assaulted" him while the trial court was in recess during sentencing. (ECF Nos. 38-34, 38-35). And in ground 28 of Riggs's proper

person state post-conviction petition, he argued that trial counsel was an accessory before the fact and the trial court was an accessory after the fact to his "sexual assault" and "rape" by the deputies. (ECF No. 37-50 at 48).

But Riggs testified at the evidentiary hearing that the deputies "didn't make physical contact" and "[t]here was no sexual penetration." (ECF No. 55-17 at 32). Rather, the deputies "didn't tell [Riggs] he was being strip searched. They just instructed [him] to remove articles of clothing one at a time." (*Id.*) One of the deputies "had his hand on the gun at the time" and said, "any noncompliance would be considered resistance." (*Id.*)

The state court interrupted Riggs asking to confirm he'd testified that nobody sexually assaulted him. (*Id.* at 33). Riggs quibbled, stating his testimony was that nobody "penetrated" him but what happened is "assault by definition." (*Id.*) He later equivocated, calling it "the strip search assault." (*Id.* at 35). Yet even later Riggs testified he understood that sexual assault is the "[u]nlawful sexual penetration" of another. (*Id.* at 64). And he did so after testifying that he nearly obtained a degree in journalism, won awards for journalism, and acknowledged "[t]o the best of [his] ability, which [he] would say is above average, yes, [he's] absolutely careful" in his writing. (*Id.* at 40–42).

Second, the state court found that Riggs falsely testified that he did not have access to his criminal case file. (*Id.* at 142). This was a reasonable determination. Riggs testified, "I don't have the entirety of my file." (*Id.* at 53). And Riggs argued in motion practice during his state post-conviction proceeding that he "never had, does not have, and cannot conceive how he ever will, from prison, [have] access to his case file materials." (ECF No. 38-18 at 3). Yet as the state court correctly recounted, (ECF No. 55-17 at 142–43), earlier Riggs had filed proper person notices about the disposition of his case file after trial counsel withdrew stating, he "received—but did not open—two boxes, each weighing about fifty (50) pounds on July 7, 2015." (ECF Nos. 37-48 at 3; 37-49 at 3).

1    Unable to retain the boxes in prison, Riggs stated that he sent them to his father
2    who arranged for them to be received and held by Puliz, a document storage
3    company. (ECF No. 37-48 at 4). Riggs stated he also arranged for a third box to
4    be collected and retain by Puliz. (*Id.* at 6–7). Riggs signed these notices "under
5    penalty of perjury." (ECF Nos. 37-38 at 14; 37-39 at 14).

6          Third, the state court concluded that the record was replete with
7    circumstantial evidence demonstrating that trial counsel "at all junctures shared
8    all critical information with [Riggs]." This was a reasonable determination. As the
9    state court correctly recounted, (ECF No. 55-17 at 27–28), Riggs submitted an
10   affidavit in support of the motions to withdraw his pleas stating that he'd read
11   the motions and detailing that he would not have pled nolo contendere but would
12   have gone to trial had the State informed him about the uncharged Oregon
13   crimes. (ECF Nos. 34-37 at 15–17; 34-38 at 15–17). The state court found it was
14   "clear that [Riggs] was communicating in detail with [trial counsel] about various
15   issues in his case and reading documents and signing affidavits." (ECF No. 55-
16   17). This was a reasonable determination.

17         Indeed, Riggs was "present in Court" during the in-camera hearing on his
18   motion to retain "expert witnesses at public expense" in which trial counsel
19   successfully argued that Riggs needed to retain a "forensic mental health expert"
20   to consult with about medical issues including "the medical claims by the
21   accuser, [Megan], about --- I mean, this young lady has significant issues, all of
22   which it seems were brought out at the Grand Jury to explain her conduct." (ECF
23   No. 55-4 at 4, 12–13, 16). Trial counsel stated the defense would be "moving to
24   exclude some of these things." (*Id.* at 13). Trial counsel also stated the defense
25   would be moving for an order requiring Megan "to produce her medical
26   records . . . ." (*Id.* at 14).

27         The record shows that trial counsel had a pattern of filing detailed and
28   thorough briefs before Riggs pled nolo contendere in either case. (*See e.g.*, ECF

Nos. 34-5, 34-8 (successful motion to dismiss the battery charge on statute-of-limitations grounds); ECF Nos. 34-9, 34-13 (response to the State's motion for an order compelling the Reno Police Department to disclose all police reports in which Riggs is the accused suspect for or pertaining to his sexual acts); ECF No. 34-15 (motion to exclude other-acts/character/propensity evidence, specifically videos and photographs of a sexual nature that were seized from Riggs's cellphone and evidence about Kayla in the case about Megan and vice versa); ECF No. 34-18 (motion to compel production of Megan's health records, permit independent medical and mental-health examinations, and exclude evidence and testimony about her health from trial); and ECF No. 34-25 (reply supporting Riggs's evidentiary motion about Megan's health)). Relatedly, in the same hearing as Riggs's plea canvas in the first case, trial counsel argued that Riggs's motion "requesting information and materials concerning [Megan's] medical and mental health condition . . . remain pending" and would require a hearing. (ECF No. 55-6). Thus, trial counsel twice discussed Megan's mental health as a defense argument in open court in front of Riggs. Yet Riggs did not raise this as an issue until two and a half years later when he filed his proper person post-conviction petition. (*See* ECF No. 37-50).

Additionally, Riggs testified that he and trial counsel discussed the "pros and cons" of the case. (ECF No. 55-17 at 72). Riggs testified that he met with trial counsel twice while he was detained after the arrest for the first case, they met three times in trial counsel's office after Riggs was released, and they met six more times in jail after Riggs was arrested for the second case. (*Id.* at 59–61). Generally, their meetings lasted 45 minutes to an hour. (*Id.* at 61–62).

Finally, the state court determined that "[t]he evidence of [Riggs] guilt is overwhelming and it's most evident in his frank denials of obvious truths, misremembering, misdescribing or not describing things which he in his own words has described at different times. I do not believe him when he says -- I sat

1  mere feet from him during his testimony, saw his demeanor, observed language,

2  observed his responses to my questions and I do not believe him when he says

3  [trial counsel] did not share details of information." (*Id.* at 147).

4        This Court finds that the NCA's rejection of Riggs's ineffective-assistance

5  claim alleging that trial counsel withheld information about Megan's brain

6  condition until after he pled nolo contendere was not based on an unreasonable

7  determination of the facts in light of the evidence before it.

8                    **ii.    28 U.S.C. § 2254(d)(1)**

9        Riggs next contends that the NCA's adjudication of his ineffective-

10  assistance claim about Megan's brain condition was an unreasonable application

11  of *Strickland* and *Hill* because the state court determined that Riggs needed to

12  prove what Megan's injuries were and how they might impact her ability to testify

13  to show prejudice. (ECF No. 65 at 23–24). The Court rejects this challenge.

14        When a petitioner alleges that trial counsel's deficient performance led him

15  to accept a guilty plea rather than go to trial, courts "consider whether the

16  defendant was prejudiced by the 'denial of the entire judicial proceeding to which

17  he had a right.'" *Lee v. United States*, 582 U.S. 357, 364 (2017) (cleaned up)

18  (quoting *Roe v. Flores-Ortega*, 528 U.S. 470, 483 (2000)). This requires the

19  petitioner to "show that there is a reasonable probability that, but for counsel's

20  errors, he would not have pleaded guilty and would have insisted on going to

21  trial." *Hill*, 474 U.S. at 59. A reasonable probability is a probability sufficient to

22  undermine confidence in the outcome.'" *Harrington*, 562 U.S. at 104 (quoting

23  *Strickland*, 466 U.S. at 694). "It is not enough 'to show that the errors had some

24  conceivable effect on the outcome of the proceeding.'" *Id.* (quoting *Strickland*, 466

25  U.S. at 693).

26        "Courts should not upset a plea solely because of *post hoc* assertions from

27  a defendant about how he would have pleaded but for his attorney's deficiencies.

28  Judges should instead look to contemporaneous evidence to substantiate a

1    defendant's expressed preferences." *Lee*, 582 U.S. at 369. "Moreover, to obtain

2    relief on this type of claim, a petitioner must convince the court that a decision

3    to reject the plea bargain would have been rational under the circumstances."

4    *Padilla v. Kentucky*, 559 U.S. 356, 372 (2010) (citing *Roe*, 528 U.S. at 486).

5        "The *Strickland* standard is a general one, so the range of reasonable

6    applications is substantial." *Harrington*, 562 U.S. at 105 (cleaned up). Thus, "[t]he

7    pivotal question is whether the state court's application of the *Strickland* standard

8    was unreasonable." *Id.* at 101. Put differently, "[u]nder § 2254(d), a habeas court

9    must determine what arguments or theories supported . . . the state court's

10   decision; and then it must ask whether it is possible fairminded jurists could

11   disagree that those arguments or theories are inconsistent with the holding in a

12   prior decision of" the Supreme Court. *Id.* at 102.

13       This Court must defer to the NCA's determination that Riggs did not testify

14   truthfully about trial counsel withholding this information before he pled nolo

15   contendere. *See Davis v. Ayala*, 576 U.S. 257, 273–74 (2015) (reiterating that

16   credibility and demeanor determinations "lie peculiarly within a trial judge's

17   province" and reviewing federal habeas courts will defer to the trial court except

18   in "exceptional circumstances"). NCA reasonably could have inferred that Riggs

19   also was not truthful when he testified that he would not have pled in either case

20   but for trial counsel's withholding that information. Arguments that Riggs's

21   testimony was not credible support the NCA's determination that he had not

22   shown prejudice for this claim.

23       Riggs's motion to exclude evidence and testimony about Megan's medical

24   conditions was filed contemporaneously with plea negotiations. (ECF No. 34-18).

25   The contents of this motion support the conclusion that rejecting the plea bargain

26   based solely on knowledge that Megan has a brain condition—without more—

27   would not have been rational under the circumstances. As trial counsel argued,

28   "[t]he subject matter is, obviously, beyond the knowledge of a lay person." (*Id.* at

7). "The evidence of Megan's medical and mental health problems also carries a great risk of engendering sympathy for Megan, sympathy which substantially outweighs any probative value of the evidence." (*Id.* at 8). This is precisely why trial counsel sought and obtained a forensic mental health expert for Riggs at public expense to consult with before trial about medical issues like Megan's brain condition. (ECF No. 55-4).

The record shows that at the time of plea negotiations, the State continued to theorize that Riggs possibly could be culpable of sexually assaulting Megan because of her brain condition. As the information supplementing the indictment provides, Riggs either "willfully and unlawfully" subjected Megan to sexual penetration of her vagina and mouth "against [her] will, or under conditions in which [Riggs] knew or should have known that [Megan] was mentally or physically incapable of resisting [his] conduct . . . ." (ECF No. 34-24 at 2, 3). NCA reasonably could have inferred that at the time Riggs pled, rejecting the plea bargain based on the limited information known about Megan's brain condition would not have been rational.

This Court finds that the NCA's rejection of Riggs's ineffective-assistance claim alleging that trial counsel withheld information about Megan's brain condition until after he pled nolo contendere was not contrary to, nor an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts. Accordingly, Riggs is not entitled to habeas relief for ground 2(a).

### 4.    Ground 2(b)—Kayla's inconsistent statements

In ground 2(b), Riggs alleges that his trial counsel was ineffective for failing to tell him before he pled nolo contendere that Kayla made inconsistent statements to investigators. (ECF No. 28 at 12–13).

//

//

### a.     Background information

SPD detectives reported that when they interviewed Kayla on the morning of the event, she "was having a difficult time explaining what had occurred." (ECF No. 39-4 at 5). Kayla initially told the detective that "she hadn't been raped." (*Id.* at 6). But when the detective asked why Kayla's male friend would call and report that she told him Riggs raped her if that wasn't true, Kayla clarified that Riggs "made her do things that she didn't want to do." (*Id.*) Specifically, Kayla told the detective that Riggs had "forced her mouth open and stuck his penis in her mouth" and also stuck his penis in her anus against her will. (*Id.*)

### b.     State court determination

In affirming the state court's denial of Riggs's post-conviction petitions, NCA held:

> Second, Riggs claimed in his petition that defense counsel was ineffective for failing to inform him that victim Kayla initially told the police he did not rape her. The district court made the following findings. Riggs' testimony that counsel did not tell him about Kayla's statement was incredible. Riggs acknowledged he met with counsel a dozen or so times, each meeting lasted an hour or longer, and they discussed the strengths and the weaknesses of the State's case at these meetings. Riggs' father testified that counsel and Riggs talked about Kayla's exculpatory statement. Riggs knew the exculpatory nature of Kayla's initial statement would have been offset at trial by her explanation of what subsequently occurred. Kayla stated there was some consensual sexual activity between her and Riggs at first, but then Riggs "brutally raped her anally and forced her to orally copulate him." It is unbelievable that Riggs did not know about this statement, that counsel did not tell Riggs about this statement, and that Riggs would have proceeded to trial if he had known about this statement. We conclude the district court's findings are supported by the record and are not clearly wrong, Riggs failed to meet his burden to demonstrate that counsel was ineffective, and the district court did not err by rejecting this claim.

(ECF No. 39-39 at 4).

### c.     Analysis

Riggs argues that the NCA's adjudication of his ineffective-assistance claim about Kayla's inconsistent statements is not entitled to deference because it was based on an unreasonable determination of the facts. Specifically, Riggs argues

1    that NCA misapprehended that his father Peter Riggs's testimony contradicted

2    his testimony when Peter's testimony was equivocal at best. (ECF No. 65 at 24).

3    This Court disagrees.

4          Peter testified that he suffered a stroke in August 2016 and suffers from

5    "aphasia and lability," which make it difficult for him to answer questions. (ECF

6    No. 55-17 at 102–03). Peter did not testify that his memory was affected. (*Id.* at

7    102–08). And Peter recalled Riggs's first arrest in March 2013, Riggs's release in

8    April 2013, and attending meetings between Riggs and trial counsel after that

9    release. (*Id.* at 103–04).

10          When asked if he recalled trial counsel telling Riggs "that one of the victims

11    had told the police that she had not been raped" Peter testified, "Yes. I believe

12    so." (*Id.* at 107). Peter brought up his intervening stroke, but the prosecutor

13    interrupted, asking if Peter recalled trial counsel telling Riggs "that one of the

14    victims had a brain injury." (*Id.*) Peter responded, "Yes. He also had in the court."

15    (*Id.*) This testimony was provided in the wider context of conversations that Peter

16    testified he'd overheard between Riggs and trial counsel when he attended their

17    meetings in which "pros and cons of the charges against" Riggs were discussed.

18    (*Id.* at 106). NCA reasonably determined that Peter's testimony undermined

19    Riggs's credibility and claim that trial counsel withheld information about Kayla's

20    inconsistent statements from him.

21          Additionally, as the Court explained in its analysis of ground 2(a), there is

22    ample evidence supporting the state court's determination that Riggs did not

23    testify truthfully that trial counsel withheld Megan's brain condition from him

24    before he pled. This Court must defer to the state court's credibility

25    determinations. Arguments that Riggs's testimony was not credible support the

26    NCA's determination that he had not shown prejudice for this claim.

27          Moreover, Riggs testified at the evidentiary hearing that trial counsel taught

28    him "there were internal contradictions" regarding Kayla's allegations. (ECF

No. 55-17 at 48). But "internal contradictions" about Kayla's allegations wouldn't matter after Riggs pled no contest to attempted sexual assault. Relatedly, Riggs testified during the evidentiary hearing that the question of when sex becomes nonconsensual for legal purposes was one of his "big questions to [trial counsel]" who "actually explained to [Riggs] this in detail, that there's a common law" about that issue. (*Id.* at 80). When Riggs couldn't recall if Kayla told him the sex was no longer consensual, the trial court quoted the following from Riggs's statement that was attached to the presentence investigation report:

> It says on February 23–24, 2023, Kayla . . . invited me to her house for a date. We had consensual vaginal and oral sex to completion during which I put my fingers in her anus with no objection from Kayla. Two hours later, during consensual vaginal sex from behind, I put my fingers in her anus. She did not object. I then placed my penis in her anus, she objected and I withdrew within seconds, but not as quickly as I could. I thought all of our sex was consensual. Later, Kayla claimed it was otherwise.

(*Id.* at 79–81).

The NCA's conclusion that Riggs did not testify truthfully that trial counsel failed to inform him about Kayla's inconsistent statements before he pled nolo contendere is not objectively unreasonable. This Court finds that the NCA's rejection of Riggs's ineffective-assistance claim alleging that trial counsel withheld information about Kayla's inconsistent statements until after he pled nolo contendere was not contrary to, nor an unreasonable application of, clearly established federal law, and it was not based on an unreasonable determination of the facts. Accordingly, Riggs is not entitled to habeas relief for ground 2(b).

### 5.  Ground 2(c)—inadmissibility of video

In ground 2(c), Riggs alleges that his trial counsel was ineffective for failing to tell him before he pled nolo contendere that video of him engaging in rough but consensual sex with Tephany was inadmissible at trial in the Nevada cases. (ECF No. 28 at 13–14).

//

### a.    State court determination

In affirming the state court's denial of Riggs's post-conviction petitions, NCA held:

> Third, Riggs claimed in his petition that defense counsel was ineffective for failing to inform him that a certain video could not be used against him at trial. The district court made the following findings. Counsel did not tell Riggs that the video would be admissible, the video allegedly depicted lawful activity, and the video would not have been relevant evidence at Riggs' trial. These findings are supported by the record and are not clearly wrong. We conclude that Riggs failed to demonstrate that counsel misadvised him about the admissibility of the video, Riggs has not shown that he was prejudiced by counsel's performance in this regard, and the district court did not err by rejecting this claim.

(ECF No. 39-39 at 4–5).

### b.    Analysis

Riggs argues that the NCA's adjudication of his ineffective-assistance claim about the video evidence is not entitled to deference because it was based on an unreasonable determination of the facts. Specifically, Riggs argues there was no testimony contradicting his claim that trial counsel told him the video could be used against him, and it's possible that trial counsel stated this because he believed the state would argue to admit the video along with evidence about the uncharged Oregon crimes. (ECF No. 65 at 24–25).

Again, there was ample evidence supporting the state court's determination that Riggs did not testify truthfully that trial counsel withheld other critical information from him before he pled. This Court must defer to the state court's credibility determinations. Arguments that Riggs's testimony was not credible support the NCA's determination that he had not shown prejudice for this claim.

Additionally, about two weeks before the first plea was entered, trial counsel moved to exclude the video of Riggs and Tephany that SPD obtained from his cellphone, arguing the video "would be substantially more prejudicial than probative" as it did not involve either Megan or Kayla and the acts were consensual but embarrassing for Riggs. (ECF No. 34-15). This was filed on the

1    heels of the State's motion to introduce prior bad act evidence. (ECF No. 34-17).

2    Notably, the State's motion did not seek to introduce the video. (*Id.*) Thus, the

3    record does not support the inference that trial counsel possibly believed that the

4    video would be admissible at trial.

5         The NCA's conclusion that Riggs did not testify truthfully that trial counsel

6    misinformed him that the video was admissible in the Nevada cases is not

7    objectively unreasonable. This Court finds that the NCA's rejection of Riggs's

8    ineffective-assistance claim alleging that trial counsel misinformed him about the

9    admissibility of video evidence until after he pled nolo contendere was not

10   contrary to, nor an unreasonable application of, clearly established federal law,

11   and it was not based on an unreasonable determination of the facts. Accordingly,

12   Riggs is not entitled to habeas relief for ground 2(c).

13   **IV.    CERTIFICATE OF APPEALABILITY**

14        Rule 11 of the Rules Governing Section 2254 Cases requires this Court to

15   issue or deny a certificate of appealability ("COA"). This Court has evaluated the

16   claims within the Petition for suitability for the issuance of a COA. Under 28

17   U.S.C. § 2253(c)(2), a COA may issue only when the petitioner has made "a

18   substantial showing of the denial of a constitutional right." With respect to claims

19   rejected on the merits, a petitioner "must demonstrate that reasonable jurists

20   would find the district court's assessment of the constitutional claims debatable

21   or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Applying this standard,

22   this Court finds that a COA is unwarranted.

23   **V.    CONCLUSION**

24        It is therefore ordered that the First Amended Petition for Writ of Habeas

25   Corpus under 28 U.S.C. § 2254 (ECF No. 28) is denied. A certificate of

26   appealability is denied.

27   //

28   //

32

1    The Clerk of the Court is directed to substitute Nethanjah Breitenbach for

2 Respondent Timothy Filson, enter judgment, and close this case.

3

4    Dated this 25th day of March 2025.

5

6

7

_____

8 ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

33